**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 19 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

MOLLY O'TOOLE, by and through
her parents and legal guardians,
KEVIN AND KATHY O'TOOLE,

    Plaintiff-Counter-
    Defendant-Appellant,

v.

OLATHE DISTRICT SCHOOLS
UNIFIED SCHOOL DISTRICT NO.
233,

    Defendant-Counter-
    Claimant-Appellee.

No. 97-3125

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 96-2329-JWL)**

---

Stephen Walker, Beachwood, Ohio (James Germer, Kansas Advocacy Program
Services, Inc., Topeka, Kansas, with him on the opening brief), for plaintiff-
counter-defendant-appellant.

Gregory P. Goheen (Daniel B. Denk with him on the brief), McAnany, Van
Cleave & Phillips, P.A., Kansas City, Kansas, for defendant-counter-claimant-
appellee.

---

Before **ANDERSON** and **KELLY**, Circuit Judges, and **BRETT**,[*] District Judge.

_____

**ANDERSON**, Circuit Judge.

_____

Plaintiff and appellant Molly O'Toole, by and through her parents Kevin and Kathy Fulgham O'Toole, appeals the district court's grant of summary judgment to the defendant Olathe District Schools Unified School District No. 233 in this case involving the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1485.[1] Molly had challenged the adequacy, under both Kansas law and the IDEA, of the educational services provided to her. We affirm.

_____

[*]The Honorable Thomas R. Brett, Senior District Judge, United States District Court for the Northern District of Oklahoma, sitting by designation

[1]The IDEA was substantially amended in 1997. See Individuals with Disabilities Education Act Amendments of 1997, Pub. L. No. 105-17, 111 Stat. 37 (1997). We have held that the Amendments do not apply retroactively. Fowler v. Unified Sch. Dist. No. 259, 128 F.3d 1431, 1436 (10th Cir. 1997). Because the events relevant to this case took place before the effective date of the Amendments, we apply the pre-Amendments version of the Act, and, unless otherwise indicated, all citations within this opinion are to that version.

## BACKGROUND

Molly was born on May 6, 1982, and experienced health problems shortly after her birth. At thirty months of age, she was diagnosed with a hearing problem and soon thereafter began using hearing aids. Subsequent evaluations revealed a moderate to severe sensorineural hearing loss in her right ear and a moderate to profound hearing loss in her left ear.

In the fall of 1988, Molly entered the District's hearing impaired program located at Scarborough Elementary School ("SEC"). While she attended SEC, an individualized educational program ("IEP") was developed for her, in accordance with the IDEA.[2] During the 1991-92 school year, Molly was in both a regular and a resource room at SEC. In the summer of 1992, Molly's biological mother died. In October of 1993 her father married Kathy Fulgham, a co-plaintiff in this case.

This case primarily involves the adequacy of the IEP developed for Molly on February 23, 1993, and subsequently amended on August 23, 1993. The IEP team which developed Molly's February IEP included Kevin O'Toole, Kathy Fulgham, and a multi-disciplinary group of SEC personnel. The district court

---

[2]The IEP is "'a written statement that sets forth the child's present performance level, goals and objectives, specific services that will enable the child to meet those goals, and evaluation criteria and procedures to determine whether the child has met the goals.'" Murray v. Montrose County Sch. Dist. RE-1J, 51 F.3d 921, 923 n.3 (10th Cir. 1995) (quoting Association for Community Living v. Romer, 992 F.2d 1040, 1043 (10th Cir. 1993)).

described the meeting as "pleasant and congenial." O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233, 963 F. Supp. 1000, 1004 (D. Kan. 1997). At the conclusion of the February IEP meeting, Mr. O'Toole received a copy of the IEP and consented to Molly's continued placement at SEC.

During the months following the February IEP meeting, Mr. O'Toole and Ms. Fulgham received reports on Molly's progress. As the district court noted, "these monitoring reports indicated that [Molly] met certain objectives, made adequate progress toward certain objectives, and did not make adequate progress toward other objectives." Id. The district court further observed, and the record supports, that "Mr. O'Toole kept in close contact with [Molly's hearing impaired teacher Deb] Stryker concerning [Molly's] academic progress between February and May of 1993." Id.

In June of 1993, Mr. O'Toole had Molly evaluated at the Central Institute for the Deaf ("CID"), located in St. Louis, Missouri. The CID's report recommended the following for Molly:

> 1. Molly is in need of full-time special education as a hearing-impaired child with children of similar age and ability. Her skills are insufficient for learning in a regular mainstream class placement. Placement in a regular fifth grade class in fall 1993 is not appropriate.
>
> 2. Molly is in need of intensive, individualized reading instruction by teachers experienced with hearing-impaired children.

-4-

3.  Molly's language and reading should be re-evaluated in one year. Her intellectual abilities should be re-evaluated in three years. She will continue to require annual hearing and hearing aid evaluations.

4.  Molly and her family should be proud of the language level she has attained despite her profound hearing impairment and her learning problems. The prognosis for continued improvement in language is considered good if she is given appropriate special education. The prognosis for improvement in reading achievement, even given intensive, individualized instruction, is guarded.

. . . .

6.  Molly should continue using her hearing aids in both ears on volume #3.

Appellant's App. Vol. 4 at 62-63. The CID's evaluation included the assessment that Molly's "nonverbal intellectual abilities are within the low average range and her verbal abilities are below the average range. . . . It is likely that Molly has learning problems in addition to her hearing impairment." Id. at 62. In July 1993 Molly was accepted as a full-time residential student at the CID. When Mr. O'Toole inquired about reimbursement for tuition and/or expenses incurred by attendance at the CID, the District informed him that tuition reimbursement was unavailable and that it would inquire into expenses reimbursement. Mr. O'Toole and Ms. Fulgham then requested an IEP meeting in late August.

The District assembled an IEP team consisting of many of the same people as attended the February IEP meeting, with a few changes. The district court found that at the August 23 IEP meeting, "the IEP team agreed to follow all of the

CID's recommendations." O'Toole, 963 F. Supp. at 1005. The O'Tooles challenge this finding. In any event, various changes were made to Molly's IEP, and at the end of the meeting, all members of the IEP team except the O'Tooles recommended that Molly remain at SEC. Mr. O'Toole disagreed and signed a form terminating the District's services to Molly. There is some disagreement about whether Mr. O'Toole was notified of his right to challenge the adequacy of the IEP through the IDEA's and Kansas' due process procedures. The O'Tooles thereafter enrolled Molly at the CID, where, according to the O'Tooles, she flourished. At oral argument, her counsel represented that she has subsequently graduated from the CID and is currently attending the Olathe public schools.

Shortly after the August IEP meeting, the District notified Mr. O'Toole that his request for reimbursement of expenses for Molly's attendance at the CID was denied. Mr. O'Toole and Ms. Fulgham then requested a due process hearing regarding Molly's placement at the CID.[3] A thirteen-day hearing took place over a nine-month period, at the end of which the hearing officer granted the District's dispositive motion, concluding that: (1) Kan. Stat. Ann. § 72-962(f) does not create a greater duty to educate disabled students than does the IDEA; (2) the O'Tooles suffered no prejudice from the District's alleged failure to inform them

---

[3]The IDEA permits dissatisfied parents like the O'Tooles to request a due process hearing before an independent hearing officer. See 20 U.S.C. § 1415(b)(2).

of their due process rights and they had no right to be informed of the possibility of reimbursement for the costs of sending Molly to the CID; (3) Molly's IEPs adequately set forth annual goals, short term objectives, evaluative criteria, and present levels of functioning; (4) the O'Tooles failed to establish that the related special education services were inappropriate, the level of services offered was inappropriate, or that she was denied necessary services; (5) Molly's degree of academic progress did not equate with a denial of the free appropriate public education ("FAPE") to which she is entitled under the IDEA; and (6) the IEP developed in February and amended in August 1993 satisfied the requirements of both Kansas law and the IDEA.

The O'Tooles appealed the hearing officer's decision to a reviewing officer appointed by the state board of education. The O'Tooles requested the opportunity to present additional evidence. After reviewing the record, the reviewing officer denied the O'Tooles' request to present new evidence, determining that additional evidence was unnecessary.

The reviewing officer then affirmed the hearing officer's decision on all but three issues. On those three issues, the reviewing officer found that the annual goals and objectives, description of related services, and statement of present levels of functioning generated in the February and August IEPs failed to meet the procedural requirements of Kansas law and the IDEA. The reviewing

officer therefore remanded the matter for a determination whether the O'Tooles were due the prospective relief of requiring that the District comply with all procedural requirements in developing future IEPs.

The O'Tooles thereafter sought review in federal district court, see 20 U.S.C. § 1415(e)(2), and the District filed a cross-appeal challenging the reviewing officer's decision concerning the IEPs' compliance with the IDEA and Kansas law and the availability of prospective relief. The district court granted the District's motion for summary judgment, holding that: (1) Kan. Stat. Ann. § 72-962(f) did not establish a higher educational standard or obligation than the IDEA; (2) Molly's IEPs "provided an adequate statement of [her] present educational performance levels;" (3) Molly's IEPs "adequately set forth annual goals;" (4) Molly's IEPs "adequately set forth short-term instructional objectives and procedures by which [her] progress could be measured on at least a twelve week basis;" (5) Molly's IEPs "contained an adequate statement of what specific related services [Molly] was to receive;" and (6) the District "has complied with the IDEA's procedures and . . . [Molly's] IEPs were reasonably calculated to enable [Molly] to receive more than de minimis educational benefits as required by the IDEA." O'Toole, 963 F. Supp. at 1012-14. The court also denied the O'Tooles' motion for enlargement of time to file a formal written request to present additional evidence under 20 U.S.C. § 1415(e)(2), finding that the

O'Tooles' "counsel did not file this motion prior to the expiration of discovery and . . . he has failed to show excusable neglect justifying his late filing." O'Toole, 963 F. Supp. at 1014-15. The court further held that, procedural violations aside, the O'Tooles had "failed to justify the need for the additional evidence." Id. at 1015.

On appeal, the O'Tooles argue: (1) Kansas has adopted a different and higher educational standard than that contained in the IDEA, as interpreted by Board of Educ. v. Rowley, 458 U.S. 176 (1982), and under that higher standard, Molly was denied a FAPE; (2) her IEPs were inadequate in a variety of ways; (3) the district court erred in refusing to consider additional evidence; (4) the exclusion of evidence relating to the impact of the introduction of sign language in a hearing impaired child's educational program denies a FAPE and violates the IDEA's due process requirements; and (5) the exclusion of additional evidence in reliance on a local rule of court violates the IDEA.

## DISCUSSION

The IDEA is designed to enable children with disabilities to have access to a FAPE designed to meet their particular needs. See Murray, 51 F.3d at 925. The Supreme Court has held that the "'basic floor of opportunity' provided by the [IDEA] consists of access to specialized instruction and related services which are

individually designed to provide educational benefit to the handicapped child."

Rowley, 485 U.S. at 201 (emphasis added). A state need not provide services "sufficient to maximize each child's potential." Id. at 198. States are, however, free to provide a higher level of education services if they wish. See Fowler, 128 F.3d at 1438 ("'State standards that impose a greater duty to educate disabled children, if they are not inconsistent with federal standards, are enforceable in federal court under the IDEA.'") (quoting Seattle Sch. Dist. No. 1 v. B.S., 82 F.3d 1493, 1499 n.2 (9th Cir. 1996)).

"The IEP is the basic mechanism through which th[e] goal [of providing a FAPE] is achieved for each disabled child." Murray, 51 F.3d at 925; see also 20 U.S.C. § 1401(a)(20).[4] The IEP is a written statement containing the following:

> (A) a statement of the present levels of educational performance of such child,
> (B) a statement of annual goals, including short-term instructional objectives,
> (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs,
> (D) a statement of the needed transition services . . .,
> (E) the projected date for initiation and anticipated duration of such services, and
> (F) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

---

[4]Among the many provisions amended by the 1997 IDEA Amendments were those relating to the IEP. As indicated, however, we apply pre-Amendments law to this case.

20 U.S.C. § 1401(a)(20); see also 34 C.F.R. § 300.346(a).

Judicial review in IDEA cases is not the typical administrative review. The district court must "independently review the evidence contained in the administrative record, accept and review additional evidence, if necessary, and make a decision based on the preponderance of the evidence, while giving 'due weight' to the administrative proceedings below." Murray, 51 F.3d at 927. Because we review the district court's grant of summary judgment, we review the district court's decision de novo, applying the same standard as it did.

There is an added wrinkle in this case, however, because the reviewing officer and the hearing officer disagreed on whether the goals and objectives, the description of related services, and the present levels of educational performance set forth in the IEPs met the procedural requirements of the IDEA and Kansas law. Thus, the question arises whether the "due weight" is to be given to the conclusion of the reviewing officer or the hearing officer on issues on which they disagreed.

Some circuits "defer to the final decision of the state authorities," observing that "it makes no difference that there may have been some disagreement among the state officers during the course of the state proceeding." Heather S. v. Wisconsin, 125 F.3d 1045, 1053 (7th Cir. 1997) (quoting Thomas v. Cincinnati Bd. of Educ., 918 F.2d 618, 624 (6th Cir. 1990)); see also Karl v.

Board of Educ., 736 F.2d 873, 877 (2d Cir. 1984). Other circuits have modified that general principle slightly, holding that although we should "defer to the appeals panel rather than the hearing officer in most circumstances," deference to a hearing officer rather than a reviewing officer who disagrees with the hearing officer may be appropriate when "the hearing officer's findings [are] based on credibility judgments unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." Carlisle Area Sch. v. Scott P., 62 F.3d 520, 529 (3d Cir. 1995); see also Fort Zumwalt Sch. Dist. v. Clynes, 119 F.3d 607, 610 (8th Cir. 1997) ("Where there is a conflict between the findings and conclusions of the hearing panel and the final reviewing officer, a court may choose to credit the hearing panel's findings based on observation of the witnesses and reject the reviewing officer's analysis if it does not appear to give sufficient weight to the views of the professional educators."), petition for cert. filed (U.S. Dec. 29, 1997) (No. 97-1568); Doyle v. Arlington County Sch. Bd., 953 F.2d 100, 104 (4th Cir. 1991) (disregarding reviewing officer's finding contrary to hearing officer where the disagreement was as to credibility of witness who only testified before the hearing officer).[5]

---

[5]The issue of deference to reviewing versus hearing officer arises both in the context of the reviewing officer's obligation, if any, to defer to the hearing officer and in

(continued...)

-12-

Thus, we will give "due weight" to the reviewing officer's decision on the issues with which he disagreed with the hearing officer, unless the hearing officer's decisions involved credibility determinations and assuming, of course, that the record supports the reviewing officer's decision. We review any legal conclusions, however, under our usual de novo standard. We also bear in mind the Supreme Court's admonition, often repeated, that "courts must be careful to avoid imposing their view of preferable educational methods upon the States." Rowley, 458 U.S. at 207.

## I. Whether Kansas Has a Higher Educational Standard

At the time Molly's IEPs were developed, Kansas provided as follows:

"Exceptional children" means persons who . . . differ in physical, mental, social, emotional or educational characteristics to the extent that special education services are necessary to enable them <u>to progress toward the maximum of their abilities or capacities</u>.

Kan. Stat. Ann. § 72-962(f)(2) (emphasis added). In 1994, the section was amended to read as follows:

---

[5](...continued)
the context of the district court's, and our court's, review of the administrative proceedings. In this case, the District cross-appealed to the district court the issue of whether the reviewing officer exceeded the scope of his authority to review the hearing officer's findings and conclusions. Because the District has not pursued that issue in this appeal, the issue of deference in this case only arises in our consideration of the "due weight" to be given the administrative proceedings.

"Exceptional children" means persons who . . . differ in physical, mental, social, emotional or educational characteristics to the extent that special education services are necessary to enable them <u>to receive educational benefits in accordance with their abilities or capacities</u>.

<u>Id.</u> (emphasis added). The O'Tooles argue that either version of the statute imposes a higher standard for the provision of special education services than <u>Rowley</u>'s "some benefit" standard under the IDEA. While they do not articulate a precise standard, the O'Tooles appear to argue that Kansas obligates school districts to provide special education services which will maximize each child's potential. We disagree.

First, as another Kansas federal district court judge has stated in rejecting the identical argument, Kan. Stat. Ann. § 72-962(f)(2) "does not—by its terms—bind the State of Kansas to anything at all." <u>Logue v. Shawnee Mission Pub. Sch. Unified Sch. Dist. No. 512</u>, 959 F. Supp. 1338, 1350 (D. Kan. 1997). Rather, it simply defines "exceptional children." It is Kan. Stat. Ann. § 72-966(a) which obligates school districts to "provide special education services for all exceptional children who are residents of the school district." Kan. Stat. Ann. § 72-966(a).

Moreover, even were we to assume that § 72-962(f)(2) obligated school districts to educate exceptional children as defined therein, the language itself does not compel the conclusion that Kansas has adopted a higher standard than

-14-

that of Rowley.  The pre-1994 amendment language defined exceptional children

as those who need services "to enable them to progress toward the maximum of

their abilities."  Requiring "progress toward" their maximum abilities is not

obviously different, and more demanding, than requiring some educational

benefit.  Additionally, § 72-961 states the legislative intent behind Kansas'

special education statutes:  "It is the purpose and intention of this act to provide

for educational opportunities which will contribute to the development of each

exceptional child in this state in accord with his or her abilities and capacities."

(emphasis added).  That language is comparable to Rowley's standard, and

certainly indicates the Kansas legislature did not intend to obligate school

districts to maximize the educational opportunities provided to exceptional

children.

Furthermore, while the O'Tooles urge us to make much of the fact that the

amended language defining exceptional children as those requiring services "to

enable them to receive educational benefits in accordance with their abilities,"

seems more similar to Rowley's standard, we cannot conclude from the fact of the

amendment alone that the earlier standard was higher.[6]  Indeed, the parties direct

---

[6]The O'Tooles argue that the amended language, requiring exceptional children to
"receive educational benefits in accordance with their abilities," is also a higher standard
than the Rowley "individually designed to provide educational benefit" standard.  See
Rowley, 458 U.S. at 201. We fail to see any meaningful distinction between receiving

(continued...)

us to no language either in the statutes themselves or in any legislative history which explains the standard under either version of the statute, or explains the reason for the amendment.[7]

The O'Tooles further argue that, even if their construction of § 72-962 is not compelled by the language and timing of amendments to the statute, a Kansas

---

[6](...continued) educational benefits in accordance with a student's abilities and receiving individually designed educational benefits. The "in accordance with" language of the Kansas statute, in our view, merely states the obvious—the services must be appropriate for, and designed to confer educational benefits in the context of, the individual's particular abilities or capacities.

[7]The O'Tooles point out that Rowley was decided in 1982, and the Kansas legislature amended § 72-962 several times since then, but did not elect to change the definition of exceptional children until 1994, when it adopted the "receive educational benefits in accordance with their abilities" language. They argue these circumstances indicate that "Kansas quite clearly opted to keep a different standard ("progress toward the maximum of their abilities or capacities") than that announced in Rowley until 1994." Appellant's Br. at 26. The cases the O'Tooles cite in support of this argument, City of Lenexa v. Board of County Comm'rs, 703 P.2d 800 (Kan. 1985) and State v. Coley, 694 P.2d 479 (Kan. 1985), state the principle that in amending a statute the legislature is presumed to have "acted with full knowledge of judicial decisions concerning the statute," City of Lenexa, 703 P.2d at 804, or "with full knowledge and information as to the subject matter of the statute, as to prior and existing legislation on the subject of the statute, and as to judicial decisions with respect to prior and existing law." Coley, 694 P.2d at 482. They do not stand for the proposition that in amending a state statute a state legislature is unambiguously declining to follow a United States Supreme Court interpretation of a federal statute.

Furthermore, as the district court held, the pre-1994 amendment language, which was in effect at the time Molly's IEPs were written, was enacted before the IDEA and before Rowley. "[I]t is impossible to infer an intent to expand the federal scheme simply from the enactment of this statute when the language in question predates the federal scheme." Doe v. Board of Educ., 9 F.3d 455, 457-58 (6th Cir. 1993).

-16-

administrative regulation, when read in conjunction with § 72-962, supports their argument. We disagree. According to the O'Tooles, the particular regulation provided as follows at the time relevant to this case:

> "Least restrictive environment" means educational placement in which, to the maximum extent appropriate, exceptional children are placed in educational programs provided the most benefit at the least distance away from regular educational placement.

Kan. Admin. Regs. § 91-12.22(aa) (emphasis added).[8] The O'Tooles argue that the emphasized phrase indicates that Kansas has "expressly elected to go beyond the standards enunciated in Rowley." Appellant's Br. at 27. We fail to see how an administrative regulation, defining "least restrictive environment" as the placement where an exceptional child receives the most benefit at the least distance away from a regular placement, evidences an intent to obligate school districts to provide any particular level of special educational services. Rather, it appears to be a restatement of the need to balance the obligation to provide a FAPE with the obligation to place the child in an environment closest to a regular educational setting.

In sum, absent any other clear indication by the Kansas legislature that it so intended, neither the language of the relevant statutes, nor the timing and content of any amendments to those statutes, convinces us that the legislature purposely

---

[8]The regulation has since been amended to delete the emphasized part, upon which the O'Tooles primarily rely.

-17-

adopted a standard requiring Kansas schools to provide educational services to exceptional children at a higher level than the IDEA requires.[9]

## II. Adequacy of the IEPs

In reviewing the adequacy of an IEP, "[w]e begin . . . by asking whether the State complied with IDEA procedures, including whether the IEP conformed with the requirements of the Act. We then determine whether the IEP was reasonably calculated to enable [the student] to receive educational benefits." Urban v.

---

[9]The O'Tooles also cite a few decisions from other circuits where courts held that the particular states had adopted higher substantive standards than the Rowley standard. Those cases are distinguishable from this case. In Burke County Bd. of Educ. v. Denton, 895 F.2d 973 (4th Cir. 1990), the court observed that the North Carolina General Assembly had specifically stated that it was "the policy of the State . . . to ensure every child a fair and full opportunity to reach his full potential." Id. at 983 (citing N.C. Gen. Stat. § 115C-106(a)). Furthermore, the North Carolina Court of Appeals had held that North Carolina's statute imposed a higher duty than did Rowley. See Harrell v. Wilson County Schs., 293 S.E.2d 687, 690 (N.C. Ct. App. 1982).

Similarly, in David D. v. Dartmouth Sch. Comm., 775 F.2d 411 (1st Cir. 1985), the First Circuit noted that the Massachusetts Supreme Judicial Court had interpreted state education law as requiring that special education programs be administered "'to assure the maximum possible development of a child with special needs.'" Id. at 423 (quoting Stock v. Massachusetts Hosp. Sch., 467 N.E.2d 448, 453 (Mass. 1984)).

By contrast, we have no definitive interpretation by a Kansas court of the substantive standard imposed by Kansas special education statutes, nor has the Kansas legislature made the kind of broad declaration of policy as did the North Carolina General Assembly. See Doe, 9 F.3d at 458 (in holding that the state did not impose a higher standard than the IDEA, the court observed that "there are no Tennessee state court decisions interpreting the special education statute in the manner suggested by the appellant").

Jefferson County Sch. Dist. R-1, 89 F.3d 720, 726 (10th Cir. 1996) (citation

omitted).  We have held, however, that "[t]echnical deviations from the

requirements of section 1401(a)(20) . . . do not render an IEP entirely invalid; to

hold otherwise would 'exalt form over substance.'"  Id. (quoting Doe v.

Defendant I, 898 F.2d 1186, 1190 (6th Cir. 1990)).  The Supreme Court has

explained the importance of compliance with the IDEA's procedural requirements

in this way:

> the congressional emphasis upon full participation of concerned
> parties throughout the development of the IEP, as well as the
> requirements that state and local plans be submitted to the Secretary
> for approval, demonstrates the legislative conviction that adequate
> compliance with the procedures prescribed would in most cases
> assure much if not all of what Congress wished in the way of
> substantive content in an IEP.

Rowley, 458 U.S. at 206.

Moreover, if we are evaluating an IEP prospectively only, we agree with

the Third Circuit which has said that "'the measure and adequacy of an IEP can

only be determined as of the time it is offered to the student, and not at some later

date. . . .  Neither the statute nor reason countenance "Monday Morning

Quarterbacking" in evaluating the appropriateness of a child's placement.'"

Carlisle Area Sch., 62 F.3d at 534 (quoting Fuhrmann v. East Hanover Bd. of

Educ., 993 F.2d 1031, 1040 (3d Cir. 1993)); see also Roland M. v. Concord Sch.

Comm., 910 F.2d 983, 992 (1st Cir. 1990) ("An IEP is a snapshot, not a

retrospective."). However, an IEP is a program, consisting of both the written IEP document, and the subsequent implementation of that document. While we evaluate the adequacy of the document from the perspective of the time it is written, the implementation of the program is an on-going, dynamic activity, which obviously must be evaluated as such. See Dixie Snow Huefner, Judicial Review of the Special Education Program Requirements Under the Education for All Handicapped Children Act: Where Have We Been and Where Should We Be Going?, 14 Harv. J.L. & Pub. Pol'y 483, 493 (1991). Thus, we do not hold that a school district can ignore the fact that an IEP is clearly failing, nor can it continue to implement year after year, without change, an IEP which fails to confer educational benefits on the student.

The Kansas regulations specify in more detail than the relevant statutes what an IEP must contain:

(1) a statement of the child's present level of educational performance. The statement shall include, as appropriate, the following information about the child: (A) health; (B) vision; (C) hearing; (D) social and emotional status; (E) general intelligence; (F) educational performance; (G) communicative status; (H) motor abilities; and (I) vocational skills;

(2) a statement of annual goals which describe the educational performance anticipated within a year's time;

(3) a statement of short-term objectives which are measurable, and intermediate steps between the present level of performance and the annual goals;

(4) objective criteria, evaluation procedures, and data collection schedules for determining whether the short-term objectives are being achieved;

(5) a statement of the specific education services and related services needed by the child, even if not all of these services currently are available in the local education agency preparing the IEP.  Any unique instructional media, methods, or behavior management procedures not ordinarily available to all students, but needed by this particular child for learning, shall be listed;

(6) a description of the extent to which the child will participate in regular classroom instruction, and other academic and non-academic environments, with nonexceptional children of the same age;

(7) the projected date for the initiation of the prescribed services and anticipated duration of the services, including a description of any extended school term services to be provided; and

(8) for students age 14 and older, a statement of needed transition services.

Kan. Admin. Regs. § 91-12-41(f).

The Federal regulations echo the statutory requirements for an IEP, see 20 U.S.C. § 1401(a)(20); 34 C.F.R. § 300.346(a), but Appendix C to Part 300 of the federal regulations provides more detailed requirements in a question-and-answer format.[10]  In response to a question about the required statement of the child's present levels of educational performance, Appendix C leaves the content of such

---

[10]Appendix C has been rewritten by the Office of Special Education Programs ("OSEP") in response to the 1997 Amendments.  The Appendix C to which we refer accompanies the pre-Amendments version of the regulations.

statements to "the discretion of participants in the IEP meetings."  34 C.F.R. § 300 App. C, question 36.  It urges, however, the statement to "accurately describe the effect of the child's disability on the child's performance in any area of education that is affected," and avoid simple labels like "mental retardation" or "deafness."  Id.  It further says test scores are appropriately included, but they should be self-explanatory or accompanied by an explanation.  "[R]aw test scores would not usually be sufficient."  Id.  Finally, "[t]here should be a direct relationship between the present levels of educational performance and the other components of the IEP."  Id.

The Appendix describes the purpose of the goals and objectives requirement as providing "a way for the child's teacher(s) and parents to be able to track the child's progress in special education.  However, the goals and objectives in the IEP are not intended to be as specific as the goals and objectives that are normally found in daily, weekly, or monthly instructional plans."  Id. question 37.  The Appendix describes short term instructional objectives as "measurable, intermediate steps between the present levels of educational performance . . . and the annual goals," which can "serve as milestones for measuring progress toward meeting the goals," or "provide general benchmarks for determining progress toward meeting the annual goals."  Id. question 39. With respect to related services, the Appendix indicates that "[t]he amount of

-22-

services to be provided must be stated in the IEP."  Further, "[t]he amount of time to be committed to each of the various services to be provided must be (1) appropriate to that specific service, and (2) stated in the IEP in a manner that is clear to all who are involved."  Id. question 51.

Finally, in response to the question whether there is a "prescribed format or length for an IEP," the Appendix states:

> No.  The format and length of an IEP are matters left to the discretion of State and local agencies.  The IEP should be as long as necessary to adequately describe a child's program.  However, as indicated [above] the IEP is not intended to be a detailed instructional plan.  The Federal IEP requirements can usually be met in a one to three page form.

Id. question 56 (emphasis added).

### A.  Compliance with Procedural Requirements

We consider first whether the IEPs conformed to the procedural requirements of the IDEA and Kansas law.

### 1.  Present Levels of Performance

Molly's IEPs, as amended, contained a statement of her present levels of performance in a number of specific areas, including listing her strengths and needs.  It included the pre-printed statement "See Special Ed. file for specialists' reports."  Appellant's App. Vol. 4 at 44.  It described her general intelligence as

-23-

"low-average to borderline ability." Id. Under "Educational performance" it referenced scores ranging from 55 to 77 on various measures of educational achievement, such as reading and math. Id. They rated her motor skills as 5 years and 10 months. Id. at 66.

The hearing officer determined that the statement of present levels of educational performance was adequate. The reviewing officer disagreed, finding that "[t]he strengths and needs listed do not accurately or clearly describe the effects of M[olly]'s disability on her performance in the areas listed[;] [r]aw scores are reported to describe present levels of functioning[;] [and] [t]he raw scores reported are not self-explanatory and no explanation is included on the IEP." Review Officer's Decision at 15-16, Addendum to Appellant's Br. at 40-41.

The district court in turn reversed the reviewing officer on this point, deciding that the O'Tooles "actively participated in the formulation of [Molly's] IEPs during which [her] present level of educational performance was thoroughly discussed and explained." O'Toole, 963 F. Supp. at 1012. The court's other rationale for reversing the reviewing officer on this point was that Molly's "IEPs also address all of the issues mentioned in [Kan. Admin. Regs.] § 91-12-41(f)(1) with the requisite specificity." Id.

We agree with the reviewing officer that the IEP does not clearly convey Molly's present levels of educational performance in a way that relates those present levels to her disability, nor does it, on its face, explain the import of the raw test scores contained therein. However, it does refer to the specialists' reports, which presumably contain more detail and which the O'Tooles do not argue were unavailable for reference. Moreover, there is no doubt that Molly's parents and her teachers were fully aware of Molly's present levels of educational performance and discussed them in detail in formulating her IEPs. Given that one of the primary goals of the procedural requirements of the IDEA is to ensure parental participation in the formulation of a child's IEP, and to ensure that the program developed actually reflects, and is based upon, the child's present levels of performance, we conclude that the statement of present levels of performance in the IEPs did not violate the procedural requirements of the IDEA and Kansas law.

## 2. Annual Goals and Short-Term Objectives

The February IEP listed six annual goals: (1) to improve reading skills; (2) to improve English language skills; (3) to facilitate academics; (4) to facilitate language; (5) to improve articulation; and (6) to enhance sport activities. Appellant's App. Vol. 4 at 45. It listed three items under "Long-range planning":

-25-

(1) "improve compliance behavior"; (2) "improve self concept"; and (3) "improve academic skills." Id. at 46. To further the first annual goal (improving reading skills), the IEP listed seven short-term objectives.[11] To implement her second annual goal (improving English language skills), the IEP listed eight short-term objectives.[12] To implement her third annual goal (facilitating academics), the

------

[11]These short-term objectives were:

A—demonstrate mastery – 89%– on her end-of-book Whistles & Dreams test.
B—pronounce each word and use it in a complete oral sentence 4 times during each unit.
C—demonstrate mastery of Focus Up & Over end of book test of 89% acc[uracy].
D—sequence correctly or answer [questions] relating to time sequence with 90% accuracy.
E—answer steps in a process questions with 90% accuracy.
F—show comprehension of her reading selections by being able to draw an appropriate conclusion to a story with 100% accuracy.
G—correctly identify different referents (he, she, there, . . .) within her reading selections with 100% accuracy.

Appellant's App. Vol. 4 at 48. The IEP stated that she was to pursue these short-term objectives five hours per week. Id.

[12]These short-term objectives were:

A—capitalize proper nouns: days & months, I, states & cities, streets, and names with 90% acc[uracy].
B—use ending punctuation correctly to 100% accuracy (.?)
C—identify nouns with 100% acc[uracy].
D—identify verbs with 100% acc[uracy].
E—Begin a sentence with a capital letter with 100% accuracy.
F—discontinue writing run-on sentences by not using the word "and" in her writings to 80% accuracy.

(continued...)

-26-

IEP listed five short-term objectives.[13]  To implement her fourth annual goal

(facilitating language), Molly's IEP listed two short-term objectives.[14]  To

---

[12](...continued)
G—write in her journal 3 to 4 times a week.
H—improve her dictionary skills to 100% accuracy to the 3rd letter, lap, lag, laugh.

Appellant's App. Vol. 4 at 49.  The IEP stated that she was to pursue these short-term objectives 2½ hours per week.  Id.

[13]These short-term objectives were:

A—have a modified Social Studies program.
B—be excused from daily science work for the remainder of the 92-93 school year – remaining in the mainstream for "special projects, presentations, and demonstrations" at her teachers' discretion.
C—have a modified spelling list [start with 3 words and build up to 10 words].
D—review any vocabulary or concept from within her mainstream classes as needed.
E—memorize 0-12 multiplication tests to 100% accuracy.

Appellant's App. Vol. 4 at 50.  The IEP stated she was to pursue these short-term objectives 3½ hours per week.  Id.

[14]These short-term objectives were:

1)  Molly will demonstrate understanding of basic concepts at 90% accuracy[:]  a) row b) farthest c) alike d) skip e) pair f) narrow g) few.
2)  Molly will show understanding of the following language structures at 90% accuracy[:]
      a) passive-reversible — ex) The boy followed the dog.
      b) complex — relative clauses ex) The boy who got hit went to the nurse.
      c) deleted sentences — The boy hit the girl and ran away.
Molly will show understanding of teacher selected vocabulary at 90% accuracy.

(continued...)

implement her fifth annual goal (improving articulation), Molly's IEP listed three short-term objectives.[15]  Finally, to implement her sixth annual goal (enhancing sports activities), Molly's IEP listed two short-term objectives.[16]

The August 1993 addendum listed five annual goals:  1) to improve social skills; 2) to present functional level curriculum; 3) to facilitate language; 4) to improve articulation; and 5) to enhance sports activities.  It reduced her time in regular classes from 56% to 25%.  It contained a number of short-term objectives

---

[14](...continued)
Appellant's App. Vol. 4 at 51.  The IEP stated Molly was to pursue these short-term objectives for 2½ hours per week.

[15]These short-term objectives were:

1) Molly will correctly articulate words from reading units at 90% accuracy as judged by SLP.
2) Molly will use appropriate loudness of speech as judged by SLP in speech room 90% of the time.
3) Molly will use s & z and sh in sentences at 90% accuracy.

Appellant's App. Vol. 4 at 52.  The IEP stated she was to pursue these objectives for 2½ hours per week.

[16]These short-term objectives were:

A—participate helping with younger children in a physical activity [younger P.E. class].
B—get involved in an outside sports activity this summer [Dad will set this up].

Appellant's App. Vol. 4 at 53.

to implement each annual goal.[17] It increased the number of related services to be

_____

[17]To implement the goal of improving social skills, the Addendum to the IEP listed:

> a. At the end of the first 9 wks Molly will have a "Circle of Friends" with whom to interact.
> b. At the end of the semester, Molly will play a game with peers after initiating this activity.
> c. At the end of the 3rd nine weeks, Molly will appropriately take turns.
> d. At the end of the school year she will interact independently with her circle of friends.

Appellant's App. Vol. 4 at 72. To implement the annual goal of presenting functional level curriculum, the Addendum listed the following short-term objectives:

> Appropriate curriculum will be identified in all academic areas. This will be done on a year long basis. Objectives will be successful increments toward achieving the curriculum.
> a. Will demonstrate that she has achieved 25% of the curriculum via passing assessments at 80% level.
> b. Will demonstrate achievement on 50% of her curriculum at semester via passing assessment at 80% level.
> c. Will demonstrate achievement on 75% of her curriculum at 3rd grading period via passing assessment at 80% level.
> d. Will demonstrate achievement on 100% of her curriculum at year end via passing assessment at 80% level.

Id. at 74. On a page labeled "Recommendations to Enhance the Instructional Program" the Addendum listed the following:

> 1. Modify Molly's curriculum to her functioning level.
> 2. Consider implementing a "Circle of Friends."
> 3. Increase time in Resource Room to 240 minutes/day.
> 4. Implement small group instruction with students at her functioning level.
> 5. Occupational Therapist screen current motor functioning.
> 6. Behavior Specialist consult with team as appropriate.
> 7. School Social Work services as appropriate.

(continued...)

made available to Molly.

The hearing officer held that while "more specific or more carefully tailored information could be provided . . . [t]here is no rational basis to believe that procedural inadequacies compromised the student's right to an appropriate education or that the parents' opportunity to participate in the formulation process has been hampered." Memorandum and Order at 18, Addendum to Appellant's Br. at 18. The reviewing officer held that certain of the short-term objectives listed under the annual goals did not set intermediate steps between the present levels of performance and the goals and/or did not "include objective criteria or evaluation procedures and data collection schedules for determining at least every 12 weeks whether the short-term objectives are being achieved." Review Officer's Decision at 14, Addendum to Appellant's Br. at 39. The officer also concluded that the five annual goals were inadequate, as they "give the parent absolutely no idea of what his child is supposed to be able to accomplish within a year's time." Id. at 16, Addendum to Appellant's Br. at 41. The district court

---

[17](...continued)

8. School counseling as appropriate.

9. Annual audiology evaluation.

10. Inclusion facilitator as appropriate.

11. Continue current placement with amended goals and recommendation implemented.

Id. at 70.

reversed the reviewing officer, stating "[b]ecause there is no legal authority [requiring the District to set more specific annual goals] and because the plaintiff's parents played an active role in the formulation of the plaintiff's IEP, the court concludes that the plaintiff's IEPs adequately set forth annual goals." O'Toole, 963 F. Supp. at 1013. With respect to the short-term objectives, the court concluded that:

> [w]hile most of [them] do not contain a specific mechanism under which [Molly's] progress is tested every twelve weeks, they all contain objective criteria by which [her] progress can be measured. Moreover, the uncontroverted evidence indicates that one of the [District's] representatives discussed [Molly's] progress with Mr. O'Toole in detail more than once every twelve weeks. Thus, although [Molly's] IEPs did not specifically provide for progress reports every twelve weeks, Mr. O'Toole clearly received such and then some.

Id.

We agree with the district court that the annual goals and short-term objectives comply with the procedural requirements of the IDEA and Kansas law. As the court noted, there is no legal authority requiring a particular level of specificity in the statement of annual goals. While some of the goals were general (to facilitate academics, to facilitate language, to present functional level curriculum), others clearly conveyed an articulable goal—to improve reading skills, to improve English language skills, to improve articulation, to improve social skills, to enhance sports activities. Moreover, while we agree that the

-31-

short-term objectives for implementing the annual goals did not contain specific criteria for evaluating progress *at least every twelve weeks*, they contained either explicit or implicit criteria for evaluating general progress toward achieving the goals.[18] Given that IEPs are not required to provide the level of detail found in monthly instructional plans, we cannot say that the goals and objectives were inadequate. While we recognize that "due weight" must be accorded the reviewing officer's conclusion of inadequacy, our own review of the record convinces us that we cannot draw the same legal conclusion from the words contained in the IEPs.

### 3. Related Services

A FAPE under the IDEA includes special education and related services, if necessary. 20 U.S.C. §§ 1412, 1401(a)(18). The regulations define "related services" as including "transportation and . . . speech pathology and audiology, psychological services, physical and occupational therapy, . . . counseling services, . . . school health services, social work services in schools, and parent

---

[18]There is no statutory requirement that evaluation of progress toward the goals be made every twelve weeks. However, the District's IEP monitoring forms stated that they would be completed every twelve weeks. Def.'s Ex. 54, Appellant's App. Vol. 4 at 56. The 1997 Amendments require parents to be given progress reports on their child as often as the school provides such progress reports to parents of non-disabled children. See 20 U.S.C. § 1414(d)(1)(A)(viii)(II)(aa) (as amended).

counseling and training." 34 C.F.R. § 300.16(a). State regulations require "a statement of the specific education services and related services needed by the child." Kan. Admin. Regs. § 91-12-41(f)(5).

Molly's IEPs stated that she would receive speech/language services for 30 minutes per day and transportation services. They also provided that an occupational therapist would "screen current motor functioning;" Molly would receive school social work services, school counseling and an inclusion facilitator "as appropriate;" she would receive an annual audiology evaluation; and a behavior specialist would consult with the IEP team "as appropriate." Appellant's App. Vol. 4 at 70.

The hearing officer found that "as appropriate" was "not a clear indication of the level of services to be provided." Memorandum and Order at 19, Addendum to Appellant's Br. at 19. She also found, however, that "[n]o evidence was introduced that a related service was requested and denied." Id. The reviewing officer disagreed with the hearing officer's ultimate disposition of this issue, finding that the IEPs did not meet the procedural requirements in the IDEA and Kansas law for describing the related services, inasmuch as "[o]nly the description of speech/language services includes a statement of the amount of services to be provided." Review Officer's Decision at 17, Addendum to

Appellant's Br. at 42.  The district court held that the statement of related

services complied with the IDEA and Kansas law because

> [t]he uncontroverted evidence indicates that [the O'Tooles] had
> ample opportunity to explore the related services provided to [Molly]
> at [Molly's] IEP meetings and that [Molly] was never denied any
> requested related services.  Moreover, the statements contained in
> the . . . IEPs describing the related services satisfy the requirements
> in 34 C.F.R. § 300.346(a)(3) and K[an]. A[dmin]. R[eg]. § 91-12-
> 41(f)(5).

O'Toole, 963 F. Supp. at 1013-14.

We agree with the reviewing officer that the term "as appropriate" fails

adequately to specify the level of related services the District committed to

provide, as required by the IDEA and Kansas law.  However, the record supports

the findings by the hearing officer and the district court that Molly was never

denied any related service her parents sought for her.[19]  "It is important to

distinguish between the statement of [related] services in the IEP and the

provision of [related] services."  Urban, 89 F.3d at 726 (emphasis added).  While

we do not condone statements that related services will be provided "as

appropriate," and while we recognize that the District should specify in its IEPs

---

[19]Of course, with respect to the time period after the August IEP meeting, when the listing of related services "as appropriate" was added to Molly's IEP, there is no evidence of the denial of a related service because the O'Tooles placed Molly at the CID.  Thus, there was never an opportunity for the District to fulfill its obligation to provide services "as appropriate."  With respect to the period before the August IEP meeting, the O'Tooles present no evidence of the denial of a related service they sought.

the level at which such services will be provided, we hold that these technical irregularities did not produce, in this case, a violation of Kansas law or the IDEA. See id.; see also Roland M., 910 F.2d at 994 ("Before an IEP is set aside, there must be some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits.").

**B.  Whether the IEPs Were Reasonably Calculated to Provide a FAPE**

Besides having to consider procedural deficiencies, we must also consider whether the IEPs were reasonably calculated to provide a FAPE and whether Molly actually received educational benefits.  See Urban, 89 F.3d at 726.  Both the hearing officer and the reviewing officer found that Molly made various degrees of progress during the 1993 school year.  While her progress was not steady in all areas, and her parents testified as to the general difficulties, emotional and otherwise, that she had with school and school work, the record fully supports the officers' conclusions by a preponderance of the evidence.[20]

---

[20]The O'Tooles argue that the record shows Molly had made no progress or actually regressed during the year.  They refer us to Defendant's Exhibits 56 through 62.  Those exhibits in fact show improvement in raw scores on all but one testing instrument.  Appellant's App. Vol. 4 at 79-85.  The O'Tooles suggest that by applying the standard

(continued...)

The record also supports the finding, made by both administrative officers and the district court, that Molly's parents were in constant communication with her teachers and were aware of Molly's status at school.

Additionally, the August addendum to Molly's IEP reflected a real attempt by the District to respond to the O'Tooles' frustration with her progress. It incorporated a number of modifications based upon Molly's CID evaluation, reduced her time in the regular classroom, provided more related services, and modified her curricular goals to reflect her functioning level. We must evaluate this IEP prospectively only, however, since the O'Tooles' removal of Molly immediately following the August IEP meeting rendered the District unable to actually implement the amended IEP. See Carlisle, 62 F.3d at 534. Viewed from

---

[20](...continued)
error of measurement, the test data could show regression or lack of progress. They do not, however, pursue this argument in a helpful way. They do not provide the actual standard error of measurement for these testing instruments, nor do they explain why these particular instruments are in fact the type suited to show educational progress. While the improvement may not have been as great as the O'Tooles wished or expected, the test scores do not show regression or failure to progress.

Additionally, the District's IEP monitoring forms show that Molly was making adequate progress on most of her short-term objectives. Id. at 40, 56. The fact that she had not fully met most of those objectives does not indicate she was not getting educational benefit. As indicated, both administrative officers found she had received educational benefit.

Moreover, we cannot overlook the fact that immediately prior to the time period in question, Molly's biological mother had died, and Mr. O'Toole testified that Molly was understandably adversely affected by that tragedy.

that perspective, while some of the stated goals were more general than the O'Tooles desired, we conclude that it was reasonably calculated to provide Molly with a FAPE. In sum, our review of the record in this case convinces us that Molly's IEPs, even if "not optimal," id. at 535, were calculated to, and did, confer some educational benefits, as required by the IDEA and Kansas law.

Furthermore, the fact that she made more progress, and by her parents' account was happier, at the CID, does not compel the conclusion that the CID was the appropriate placement for her under the IDEA and Kansas law, and that her IEP as implemented at SEC was inappropriate. As we have said, "'the "appropriate" education required by the Act is not one which is guaranteed to maximize the child's potential.'" Urban, 89 F.3d at 727 (quoting Johnson v. Independent Sch. Dist. No. 4, 921 F.2d 1022, 1025-26 (10th Cir. 1990)). And as the Second Circuit recently acknowledged, "[a] disabled child is 'not . . . entitled to placement in a residential school merely because the latter would more nearly enable the child to reach his or her full potential.'" Walczak v. Florida Union Free Sch. Dist., __ F.3d __, No. 97-7155, 1998 WL 177971, at *20 (2d Cir. April 16, 1998) (quoting Abrahamson v. Hershman, 701 F.2d 223, 227 (1st Cir. 1983)); see also Heather S., 125 F.3d at 1057 ("The school district is required by the statute and regulations to provide an appropriate education, not the best possible education, or the placement the parents prefer.") (citation omitted); Fort Zumwalt

Sch. Dist., 119 F.3d at 613 ("IDEA does not require the best possible education or superior results."). Accordingly, an IEP is not inadequate "simply because parents show that a child makes better progress in a different program." Walczak, 1998 WL 177971, at *21; see also Fuhrmann, 993 F.2d at 1039-40.

We therefore hold that the record supports the conclusion that Molly's IEPs were reasonably calculated to confer educational benefit on her and she made sufficient progress toward achieving her IEP goals in the 1993 school year. The IDEA and Kansas law require no more.

## III. Exclusion of Evidence

The O'Tooles next argue that the district court and the hearing officer violated the IDEA by refusing to permit them to submit additional evidence, including evidence "relating to the impact of the introduction of sign language into a hearing impaired child's educational program." Appellant's Br. at 41.

The O'Tooles first argue the district court erred in refusing to admit additional evidence, although they do not specify exactly what evidence they wished to have admitted.[21] As the District points out, the district court actually denied the O'Tooles' motion for an enlargement of time in which to file a formal

_____

[21]At oral argument the O'Tooles' counsel suggested that the additional evidence is evidence on how the introduction of sign language affects the spoken language skills of a hearing impaired child.

-38-

written request to submit additional evidence. After granting summary judgment to the District, the district court held that the District's motion to prevent the O'Tooles from submitting additional evidence was moot.

20 U.S.C. § 1415(e)(2) provides that the district court in an IDEA case "shall receive the records of the administrative proceedings [and] shall hear additional evidence at the request of a party." We have held that the district court has discretion to determine if such additional evidence is necessary. See Murray, 51 F.3d at 927; see also Monticello Sch. Dist. No. 25 v. George L., 102 F.3d 895, 901 (7th Cir. 1996); Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 759-60 (3d Cir. 1995); Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1473 (9th Cir. 1993). The district court denied the O'Tooles' motion for enlargement of time to file a formal written request to present additional evidence because their counsel failed to explain "why he did not timely identify and produce such evidence during the discovery period, which closed over three months prior to the filing of this motion." O'Toole, 963 F. Supp. at 1014. We review motions for an enlargement of time for abuse of discretion. Buchanan v. Sherrill, 51 F.3d 227, 228 (10th Cir. 1995). We find no abuse of discretion in the district court's decision in this case not to enlarge the time in which the O'Tooles could seek to submit additional evidence.

-39-

The O'Tooles also argue that the hearing officer erred in precluding the presentation of "evidence as relates to the impact that sign language has on the development of spoken language skills." Appellant's Br. at 41. They acknowledge that the Supreme Court has said that "once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States." Rowley, 458 U.S. at 208; see also Lachman v. Illinois State Bd. of Educ., 852 F.2d 290, 292 (7th Cir. 1988). They also do not dispute that, in general, the debate about whether sign language or spoken language is the best way to educate the hearing impaired involves a dispute about methodology. The O'Tooles attempt to distinguish Rowley and the other cases by arguing that this case does not involve a dispute about the methodology to be used in an appropriate placement, or in choosing between two appropriate placements, but rather, in this case, the choice of methodology *itself* renders the District's placement (i.e., at SEC) inappropriate.

Despite the O'Tooles' effort to cast this methodological debate as a debate about appropriate placement, we conclude that, in reality, the O'Tooles' complaint relates to the best methodology for educating a hearing impaired child. That is precisely the kind of issue which is properly resolved by local educators and experts. Thus, we perceive no error in the hearing officer's decision not to permit the introduction of evidence as to which methodology best serves a hearing

impaired child.[22]   We have held that the IDEA was not violated; having held so, we decline to find error in the refusal by the administrative officers to engage in a dispute about methodology.

## IV.  District Court's Reliance on Local Rule

Finally, the O'Tooles argue the district court erred in relying on its local rule, D. Kan. R. 56.1, to exclude evidence in its consideration of the District's motion for summary judgment.  Rule 56.1 requires motions for summary judgment to identify disputed facts and provide citations to the record in support thereof. The O'Tooles' argument appears to be that the district court, in requiring compliance with Rule 56.1 and excluding evidence submitted in violation of the rule, somehow violated its obligation under the IDEA to conduct a modified de novo review of the administrative record and any other materials submitted by the parties and accepted by the court.

The O'Tooles do not dispute, as they could not, that summary judgment can be granted in IDEA cases.  However, as everyone acknowledges, summary judgment in such cases is somewhat unusual, in light of the district court's obligation to independently review the record and reach a decision based on a

---

[22]As the Supreme Court acknowledged in <u>Rowley</u>, the question of which method is best for educating the hearing impaired has been "long debated among scholars." <u>Rowley</u>, 458 U.S. at 207 n.29.

preponderance of the evidence. We perceive neither an inherent inconsistency between following a rule like Rule 56.1 and following the requirements of the IDEA, nor do we perceive any actual failure by the district court in this case to exercise its review properly under the IDEA. In any event, we have conducted our own independent review of the record in affirming the judgment of the district court.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.