Ben JOHNSON, by and through his parents and legal guardians, Ron and Susan JOHNSON, Plaintiffs,

v.

OLATHE DISTRICT SCHOOLS UNIFIED SCHOOL DISTRICT NO. 233, Special Services Division, Defendant.

No. CIV.A. 02–2164–CM.

United States District Court, D. Kansas.

Dec. 9, 2003.

Jeffery A. Sutton, Jamison & Associates LLC, Mission, KS, for Plaintiffs.

Melissa D. Hillman, Michael G. Norris, Norris, Keplinger & Hillman, L.L.C., Overland Park, KS, for Defendant.

### MEMORANDUM AND ORDER

MURGUIA, District Judge.

This matter comes before the court on Defendant's Motion for Judgment as a Matter of Law, or in the Alternative, Motion for Summary Judgment (Doc. 27). Plaintiffs bring their claim, seeking relief under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* Plaintiffs first sought redress at a due process hearing, but failing there, they seek review before this court.

## I. Legal Standards

### A. Rule 52(c) Judgment on Partial Findings

The court determined in its June 23, 2003, Order that it would consider defendant's motion for summary judgment as a motion for judgment on partial findings, pursuant to Federal Rule of Civil Procedure 52(c). Rule 52(c) states that, after a party has fully presented its evidence, the court may enter judgment as a matter of law against the party's claims that are not supported by controlling law. The court reviews all evidence presented as the final factfinder and without presumptions in favor of either party. *Winning Ways, Inc. v. Holloway Sportswear, Inc.,* 913 F.Supp. 1454, 1460 (D.Kan.1996); *Geddes v. N.W. Mo. State Univ.,* 49 F.3d 426, 429 n. 7 (8th Cir.1995). The court must then determine whether the plaintiff "has demonstrated factual and legal right to relief by a preponderance of the evidence." *Winning Ways,* 913 F.Supp. at 1460 (*citing Roth v. Am. Hosp. Supply Corp.,* 965 F.2d 862, 865 (10th Cir.1992)). The court's ruling shall be supported by findings of facts and conclusions of law. Fed.R.Civ.P. 52(c).

### B. IDEA

IDEA provides federal funding to state and local educational agencies who must then provide educational opportunities for students with disabilities. The purpose of IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d). A free appropriate public education ("FAPE") is one provided at public expense, under public supervision and direction, and in conformity with an individualized education program ("IEP") developed for the child. *Id.* § 1401(8). The obligation to provide a FAPE does not require a state to "maximize each child's potential." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley,* 458 U.S. 176, 198, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); *see also* 20 U.S.C. § 1401(8)(D). It is necessary, however, for a state to develop a personalized instruction plan that allows the child to benefit educationally. *Row-*

*ley,* 458 U.S. at 203–04, 102 S.Ct. 3034. The IEP is the blueprint for successfully formulating and achieving this goal. *Murray v. Montrose County Sch. Dist.,* 51 F.3d 921, 925 (10th Cir.1995); *see also* 20 U.S.C. § 1401(11). IDEA contains numerous procedural steps that a state must follow in order to properly design and implement an IEP. *See* 20 U.S.C. § 1414(d); *O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233,* 144 F.3d 692, 698 (10th Cir.1998).

IDEA also mandates several substantive requirements, including the requirement that a state educate a student with disabilities in · the least restrictive environment ("LRE"). 20 U.S.C. § 1412(a)(5); *Murray,* 51 F.3d at 925–26. The LRE component of providing a FAPE dictates that the state should integrate a disabled child with non-disabled children whenever possible. Federal law requires that:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5).

A parent of a child with a disability may contest any action by the school district that the parent believes deprives the child of a FAPE. 20 U.S.C. § 1415(b)(6). The educational agency must then provide the parent with an impartial due process hearing to evaluate the complaint. 20 U.S.C. § 1415(f). Any party aggrieved by the outcome of the due process hearing may the appeal the decision in a United States District Court. 20 U.S.C. § 1415(i)(2)(A).

## C. Judicial Review Under IDEA

In reviewing a challenge under IDEA, the district court engages in a modified de novo review of the administrative adjudications below. *Erickson v. Albuquerque Pub. Sch.,* 199 F.3d 1116, 1120 (10th Cir.1999). The district court independently reviews the administrative record, hears any additional evidence at the request of the parties, if necessary, and then makes its decision based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(B). Nevertheless, because the court receives the records of the administrative proceedings, IDEA requires the court to give "due weight" to the decisions made at the proceedings. *Bd. of Educ. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

In *Rowley,* the Supreme Court outlined the analysis that a court should perform when reviewing administrative decisions under IDEA. *Id.* at 206–07, 102 S.Ct. 3034. The court must first consider whether the state complied with IDEA procedures, including whether the IEP conformed with the requirements of IDEA. *Id.; Urban v. Jefferson County Sch. Dist. R–1,* 89 F.3d 720, 726 (10th Cir.1996). The court then determines whether the IEP developed through IDEA's procedures is reasonably calculated to enable the child to receive educational benefits. *Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034; *Urban,* 89 F.3d at 726.

Technical deviations from the procedural requirements of developing an IEP do not automatically lead to the conclusion that the IEP is invalid. *Urban,* 89 F.3d at 726. Rather, " 'there must be some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, ser-

iously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits.'" *O'Toole,* 144 F.3d at 707 (quoting *Roland M. v. Concord Sch. Comm.,* 910 F.2d 983, 994 (1st Cir.1990)). Further, the Supreme Court has warned that reviewing courts "must be careful to avoid imposing their view of preferable educational methods upon the States." *Rowley,* 458 U.S. at 207, 102 S.Ct. 3034. The courts "lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy'" that Congress properly left to the states' expertise. *Id.* at 208, 102 S.Ct. 3034 (quoting *San Antonio Indep. Sch. Dist. v. Rodriquez,* 411 U.S. 1, 42, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)).

█ The party attacking a child's IEP bears the burden of proof to show why the IEP is inadequate or did not provide the child with educational benefit. *Johnson v. Indep. Sch. Dist. No. 4 of Bixby, Tulsa County, Okla.,* 921 F.2d 1022, 1026 (10th Cir.1990). IDEA creates a " 'presumption in favor of the educational placement established by'" [the child's IEP], and " 'the party attacking its terms should bear the burden of showing why the educational setting established by the [IEP] is not appropriate.'" *Id.* (quoting *Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ.,* 790 F.2d 1153, 1158 (5th Cir.1986)).

## II. Facts

### A. Due Process Hearing

Ben Johnson was born on November 7, 1987, and lives with his parents, Ron and Susan Johnson, in Olathe, Kansas. Ben is autistic and meets the criteria for severe mental retardation. Ben has attended school in the Olathe School District since preschool, participating in the regular classroom up through the 4th grade. Beginning in the 5th grade, Ben spent the majority of his educational day in a one-on-one environment, with at least some time in the regular classroom.

In May 2000, near the end of Ben's 6th-grade year, defendant and plaintiffs convened an IEP team meeting. One purpose of the meeting was to discuss extended school year ("ESY") services for Ben. The tone of the meeting was contentious, and plaintiffs did not participate in discussions relating to placement options other than a home program. Further, plaintiffs did not consent to the ESY plan adopted by the IEP team, and, on May 30, 2000, they withdrew Ben from the school system.

Defendant and plaintiffs met again in July 2000 to establish an IEP for the summer and for the fall school semester. The IEP team considered home placement, but rejected the proposal before deciding that the most appropriate environment for Ben was Pioneer Trail Junior High's ("PTJH") Lifeskills classroom. Plaintiffs did not consent to this IEP.

Following the July 2000 IEP meeting, plaintiffs requested a due process hearing to present their complaints against defendant. The subject matter of the hearing is of some dispute between the parties. Defendant alleges that plaintiffs disagreed with the IEP team because the rest of the team would not consent to their request for home placement for Ben. Plaintiffs, on the other hand, contend that the key issue was the teaching methodology applied to Ben.

On September 7 and 8, 2000, Dr. Vincent Barone, defendant's applied behavioral analysis ("ABA") consultant, and Ms. Katie Cook, defendant's autism consultant, visited plaintiffs' home several times. The purpose of their visit was to observe and evaluate the home program that plaintiffs were providing for Ben. Dr. Barone concluded that, while there were positive aspects of his home program, the environment was not the appropriate placement

for Ben. Plaintiffs contest Dr. Barone's finding that Ben did not have sufficient contact with peers, arguing that he had frequent interaction with a friend in the neighborhood. Plaintiffs also criticize Dr. Barone's finding that Ben did not have access to occupational therapy, speech therapy, and music therapy, arguing that Ben's November 20, 2002, IEP did not list these related services.

Dr. Barone also visited plaintiffs' home in October 2000 in order to perform a functional behavioral assessment. The purpose of the assessment was to identify Ben's problematic behaviors and suggest strategies to address those that were impeding his ability to learn.

The parties settled the due process complaint on December 7, 2000. Plaintiffs agreed to enroll Ben at PTJH and to his placement in the PTJH Lifeskills classroom. The settlement agreement references the November 20, 2000, IEP meeting in which the parties developed a new IEP for Ben. Defendant agreed to utilize Dr. Barone, or a replacement ABA consultant, to assist in implementing Ben's IEP. The parties also agreed that Cook would be Ben's interim case manager (with assistance from Ms. Erin Dugan) until defendant hired a new staff person.

### B. November 20, 2000, IEP

The following individuals comprised Ben Johnson's IEP team and were present at the November 20, 2000, meeting: (1) Ron and Susan Johnson; (2) Gerald Reynaud, Executive Director of Special Services for Olathe School District, who was responsible for overseeing the special education services for the district; (3) Dr. Vincent Barone, who holds a Ph.D. in developmental psychology and served as a consultant for a number of school districts in Kansas, Missouri, and Nebraska; (4) Erin Dugan, Assistant Director of Special Services for the Olathe School District, who was re-sponsible for providing services to all autistic students; (5) Carol Affholder, music therapist; (6) Karey Ficken, Assistant Principal at PTJH; and (7) Katie Cook, consultant to the district, who served as Ben Johnson's case manager and teacher.

Ben's November 20, 2000, IEP established a plan to transition him from home to PTJH. Brooke DeWitt, who began working as Ben's paraeducator in his home on August 16, 2000, also served as Ben's initial paraeducator at PTJH, under the supervision of Cook, Dr. Barone, and Dugan. The plan started Ben at PTJH from 12:30 p.m. to 2:30 p.m., and then steadily increased his hours of attendance over the subsequent weeks. The parties concurred that the most appropriate placement for Ben would be the PTJH Lifeskills classroom. The IEP team considered other placements before unanimously agreeing upon the Lifeskills classroom, which offered one-on-one instruction for Ben. Ben's IEP also planned for him to participate in specially designed physical education activities at PTJH. While he attended PTJH, from January 4 to February 7, 2001, part of his scheduled day included a gym activity.

The IEP contained a goal and short-term objectives to address Ben's maladaptive behavior. However, the IEP team did not adopt a behavior management plan or behavior intervention plan. Instead, the IEP stated that the team would meet again in six weeks, and, if necessary, review and revise Dr. Barone's October 2000, functional behavior assessment. In general, the IEP team and plaintiffs discussed that Ben's transition plan would be adjusted as necessary depending on Ben's reaction to his environment at PTJH.

### C. Ben's Home Education from October 2 through December 28, 2000

Before enrolling Ben at PTJH pursuant to his November 20, 2000, IEP, plaintiffs

provided Ben's education at their home. Plaintiffs collected empirical data on the percent of intervals that Ben displayed aggressive behavior. Defendant transformed plaintiffs' data into graphical form and drew what are termed "trend lines" through the data points. One line was drawn for data collected in the morning, and one line drawn for data collected in the afternoon. Defendant argues that the trend line for the afternoon shows an increase in the percent of intervals from October 2 to December 28, 2000. Plaintiffs contend that the increase is only slight, and, nevertheless, that there is no significant difference between the two trends.

The court is unable to resolve the discrepancy between the parties' respective interpretations of Ben's home behavior. Defendant's trend lines are labeled as "[l]inear," which the court interprets to mean that the lines are linear regressions of the two data sets, but there is no clear indication of this fact. But more importantly, there was no statistical analyses done to demonstrate whether the afternoon data's increasing slope is statistically significant, or if the difference in the slopes of the morning and afternoon is statistically significant. The court is acting as the final factfinder for purposes of this review, but absent the necessary analysis of the empirical data presented, the court reaches no conclusion as to its interpretation of the data.

Plaintiffs also recorded descriptive data of Ben's behaviors during that time period. Consistent to his diagnosis, Ben frequently displayed emotional and physical outbursts, including jumping out of his chair, grabbing parents' or teachers' necks, chins, noses, ears, and hitting parents or teachers. To address Ben's behavior, plaintiffs employed redirection, but decided to use planned ignoring beginning in December 2000.

Ben's academic performance in November and December 2000 declined in the areas of reading, writing, math, and language.

### D. Pioneer Trail Junior High

Ben started at PTJH on January 4, 2001. Both DeWitt and Carrie Seckar provided paraeducation services to Ben. Seckar first worked with Ben in May until December 1998. Seckar than started working with Ben again at home and at PTJH in January 2001.

Defendant employed both redirection and planned ignoring to address Ben's behaviors. During the initial weeks of Ben's return to school, his teachers did not collect fully descriptive data of his behaviors, and they did not keep written data on his academic performance.

Plaintiffs and defendant met on January 12, 2001, for an IEP meeting. The parties agreed to increase Ben's school day by 30 minutes each day. Dr. Barone also informed the team that he wanted to better define Ben's aggressive behaviors for observation and collection purposes.

The parties met again for a January 22, 2001, IEP meeting. Dr. Barone informed the team that he had instructed the paraeducators to begin taking more hand-written notes about Ben's aggressive behaviors. The IEP team suggested starting Ben on some new academic programs, but Mrs. Johnson disagreed with their proposal. The IEP team also suggested increasing Ben's academic day from 9:00 a.m. to 3:00 p.m., but plaintiffs rejected that proposal as well.

Leading up to the January 22, 2001, IEP meeting, Dr. Barone repeatedly discussed with the IEP and plaintiffs his concerns over the use of planned ignoring to control Ben's behaviors. Dr. Barone did not feel that the strategy effectively addressed the

basis for Ben's behaviors. From January 4 through January 22, 2001, Ben's aggressive behaviors were of a longer duration. On January 22, 2001, Dr. Barone implemented redirection as the sole methodology to address Ben's behaviors. Defendant asserts that redirection effectively addressed Ben's maladaptive behaviors, and that Ben responded by returning his attention to his academic task. Plaintiffs contend, however, that defendant's own graphs produced from empirical data collected during that time period show that Ben's aggressive behaviors were increasing.

The graphical data presented to the court are plagued by the same inadequacies as those discussed above. It appears that linear regressions were performed on the data points, but there is no indication of whether there was a statistically significant increase in Ben's aggressive behaviors over time. The court, therefore, cannot conclude whether the graph provides persuasive evidence for either party.

Plaintiffs began to consult with Dr. Donald Baer, beginning on January 24, about possible recommendations to Ben's transition plan at PTJH.

### E. January 31, 2001, IEP Meeting

The IEP team met on January 31, 2001, to discuss Ben's performance at PTJH and revise his IEP as needed. Plaintiffs introduced the recommendations of Dr. Baer and requested that defendant provide services to Ben at their home in the morning, with his afternoon education to continue at PTJH. The rest of the IEP team did not agree with this placement request and instead proposed that Ben's day at PTJH be increased. Plaintiffs, displeased with Dr. Barone's exclusive use of redirection, rejected the IEP team's proposal, and so the team did not extend the time Ben spent at PTJH.

### F. February 12, 2001, IEP Meeting

The parties disagree as to the incidence of Ben's aggressive behaviors from January 4 to February 7, 2001. Defendant contends that Ben's aggressive behavior was either stabilizing or improving over the time period. Plaintiffs, however, allege that Ben's behavior continued to deteriorate after January 22, when defendant began using the redirection behavioral methodology. Plaintiffs contend that, as a result of Ben's increase in aggressive behavior, they were forced to keep Ben home from school on February 8 and 9.

The IEP team met on February 12, 2001, to develop a revised transition plan ("RTP"). Plaintiffs again presented Dr. Baer's recommendations and requested that defendant provide Ben with a full day of services at their home. The rest of the IEP team, however, decided that Ben should continue to attend PTJH. The IEP team concluded that Ben's behavior was more manageable in the morning, and, consequently, the revised plan altered Ben's schedule by having him attend PTJH in the morning, from 9:30 a.m. until 12:00 p.m.

The IEP team also determined that Seckar, rather than DeWitt, should be Ben's primary paraeducator. The IEP team was concerned that Ben's aggressive behaviors might be paired with DeWitt, and, therefore, decided to separate DeWitt from Ben. The team discussions called for DeWitt to be gradually reintroduced as part of Ben's afternoon educational programming.

The RTP lists fourteen recommendations from the IEP team for revising Ben's transition plan. For example, item eleven calls for Ben to have "[p]ool time" at 11:40 a.m., which would constitute a physical activity for Ben. Plaintiffs state, however, that items nine through fourteen were never discussed with them.

Plaintiffs met with Dr. Baer on February 14, 2001, to discuss Ben's RTP. Dr. Baer wrote a letter to the rest of the IEP team in which he criticized aspects of Ben's RTP and outlined the details of an alternate transition plan. Dr. Baer recommended that planned ignoring be used to control Ben's behavior. Dr. Baer also recommended that Ben's teachers be trained in the home environment, where Dr. Baer felt that Ben had achieved more success, and then transition both Ben and his teachers back to PTJH.

### G. March 7, 2001, IEP Meeting

On March 3, 2001, six defendant employees of Ben's IEP team participated in a telephone conference with two outside autism experts, Dr. Dunlap and Dr. Simpson. The purpose of the meeting was to review Ben's RTP and to discuss Dr. Baer's proposed transition plan. Both experts concluded that Ben's current RTP was sufficient.

The IEP team met on March 7, 2001. Plaintiffs again contended that Ben's transition plan should follow Dr. Baer's recommendations and expressed their frustration at the IEP team's conclusions. After both sides failed to reach agreement concerning Ben's transition plan, the meeting ended. Plaintiffs decided that they would not return Ben to PTJH.

### H. Ben's Home Placement From April Until June, 2001

Plaintiffs began schooling Ben at home following his removal from PTJH. DeWitt and plaintiffs testified to anecdotal incidences of Ben's aggressive behavior. Plaintiffs also collected empirical data of the percent of intervals of aggression and self-stimulation. Defendant contends that a graphical representation of the · data demonstrates that Ben's maladaptive behavior increased from April to June 2001. Plaintiffs allege that the graphs are misleading because their axes ·have been skewed to enhance the appearance of the slope. Therein lies the problem with all the empirical data presented to the court. The court cannot reach conclusions as to the probative value of the data by evaluating subjective interpretations of subjectively drawn graphs, particularly when more objective analyses are available. Further, even if the data were properly analyzed, the court notes that the parties failed to utilize standardized collection methodologies with respect to the type of data collected or the time interval of collection.

### I. Due Process Hearing

The parties participated in a due process hearing beginning in March 2001. On November 5, 2001, the due process hearing officer ruled in favor of defendant and concluded that: (1) defendant complied with the procedural requirements of IDEA in developing Ben's IEP; (2) the November 20, 2000, IEP and February 13, 2001, RTP placed Ben in the LRE; (3) the November 20, 2000, IEP and February 13, 2001, RTP were reasonably calculated to provide Ben with a FAPE. Plaintiffs appealed the ruling, but, on March 12, 2002, the state hearing officer affirmed the due process hearing officer's decision.

### III. Analysis

Plaintiffs assert that defendant violated numerous provisions of IDEA. Certain of plaintiffs' assertions constitute pure procedural violations, while other allegations encompass both procedural and substantive components.

### A. Alleged Violations of IDEA

#### 1. Members of Ben Johnson's IEP Team

The district is responsible for assembling an appropriate IEP team that drafts and then implements a disabled student's

IEP. 20 U.S.C. § 1414(d). Federal and Kansas law require that the IEP team include, among others, a regular education teacher, if such a teacher will be instructing the child, and a special education teacher.[1] *Id.* § 1414(d)(1)(B); Kan. Stat. Ann. § 72–962(u); Kan. Admin. Regs. 91–40–1(ii).

Plaintiffs allege that defendant drafted and implemented Ben Johnson's November 20, 2000, IEP and the February 13, 2001, RTP without the necessary team members required under federal and Kansas special education law. Specifically, plaintiffs assert that the team should have included Ms. Denise Hurt as the special education teacher, a general education teacher, and DeWitt.

The record shows that Ben's November 20, 2000, IEP team included: (1) Ron and Susan Johnson, (2) Reynaud, (3) Dr. Barone, (4) Dugan, (5) Affholder, (6) Ficken, and (7) Cook. The same team also approved Ben's February 13, 2001, RTP.

Plaintiffs assert that the IEP Team did not include a special education teacher, who would be primarily responsible for implementing Ben's plan. Dr. Reynaud testified during plaintiffs' due process hearing that Ms. Cook served as Ben Johnson's case manager, but that the position was synonymous to teacher because she was primarily responsible for implementing the IEP. Plaintiffs contend, however, that Cook cannot be classified as a special education teacher because defendant employed her under the title of case manager. As further proof of their claim, plaintiffs point out that the "special services provider" signature line was left blank on the IEP.

■ The court concludes that defendant did not deny Ben a FAPE by not having a member on his team with the title of special education teacher. Both Cook and Dugan were responsible for teaching Ben and working directly with him, which is the role that a special education teacher would fill. Any failure by defendant is in this case, therefore, merely technical rather than a substantial failure to provide Ben with a FAPE.

Plaintiffs also assert that defendant failed to include a general education teacher on Ben's IEP team. The IEP team never contemplated that Ben Johnson would participate in the general educational curriculum, which precludes the requirement for a general education teacher. Plaintiffs argue, however, that defendant was required to provide Ben Johnson with physical education opportunities; therefore, a physical education teacher should have served on the IEP team. In particular, plaintiffs contend that Ben was physi-

---

1. In full, 20 U.S.C. § 1414(d)(1)(B) provides that the IEP team shall include:

 (i) the parents of a child with a disability;
 (ii) at least one regular education teacher of such child (if the child is, or may be, participating in the regular education environment);
 (iii) at least one special education teacher, or where appropriate, at least one special education provider of such child;
 (iv) a representative of the local educational agency who—
 (I) is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities;

 (II) is knowledgeable about the general curriculum; and
 (III) is knowledgeable about the availability of resources of the local educational agency;
 (v) an individual who can interpret the instructional implications of evaluation results, who may be a member of the team described in clauses (ii) through (vi);
 (vi) at the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate; and
 (vii) whenever appropriate, the child with a disability.

cally capable of participating in a general physical education class, rather than a specially designed program.

Kansas law provides that each agency shall make physical education services, specially designed if necessary, available to every child with a disability. Kan. Admin. Regs. 91–40–3(c)(1). From the time that Ben returned to school on January 4 until February 7, 2001, he attended school only two and one-half hours per day, in accordance with his transition plan. During that time, defendant provided Ben with a specially designed physical education curriculum.

The court reaches no conclusion as to whether Ben was physically capable of participating in integrated physical education classes. As part of his November 20, 2000, IEP, his team, including plaintiffs, determined that Ben should participate in a specialized physical education program. Then, at Ben's February 12, 2001, revised transition IEP meeting, his team concluded that he should continue specialized physical education in the swimming pool. Plaintiffs contend that the rest of the IEP team never discussed Ben engaging in physical exercise in the pool at PTJH. Nevertheless, the court concludes that defendant properly planned for Ben's physical education. Considering that Ben attended PTJH only two and one-half hours per day as part of his transition plan, the court concludes that the specially designed program did not deprive Ben of a FAPE, and that a physical education teacher was not needed on his IEP team.

Plaintiffs also assert that DeWitt should have attended Ben's January 31, February 12, and March 7, 2001, IEP meetings. Plaintiffs allege that DeWitt was the most knowledgeable about Ben's educational and behavioral needs, and that she was the only individual capable of integrating his home and school programs.

The court concludes that DeWitt's absence from the meetings did not deprive Ben of a FAPE. Neither federal nor Kansas law require DeWitt's presence. Defendant ensured that all necessary individuals attended Ben's IEP meetings. Additional professionals could have attended the meetings at the parents' request, but plaintiffs make no allegations of an ignored request in this case.

## 2. Least Restrictive Environment

Federal law and Kansas administrative regulations require a state to educate children with disabilities in the LRE. The agency must determine the LRE by considering the "continuum of alternative educational placements ... to meet the needs of children with disabilities." Kan. Admin. Regs. 90–40–21(b). According to plaintiffs, defendant failed to consider home placement or the full continuum of placement options for Ben. Plaintiffs contend that Reynaud admitted in his testimony that defendant would not have considered home placement for Ben because of his age. Therefore, plaintiffs argue, defendant did not consider the full continuum of educational placements.

The record, however, does not support plaintiffs' argument. At issue is whether defendants properly determined the LRE in which to educate Ben. The Notice for Placement and Request for Consent from the November 20, 2000, IEP meeting specifically documents that the IEP team considered but rejected placing Ben in the general education classroom based upon his needs. The Notice also indicates that the IEP team concluded that Ben should be returned to PTJH from his home in order to facilitate peer interactions. Moreover, before the November 20, 2000, IEP meeting had convened, plaintiffs entered into settlement discussions with defendant following plaintiffs' decision to

withdraw Ben from PTJH at the end of his 6th-grade year. As a result of the settlement discussions, the IEP team was aware that plaintiffs had agreed to return Ben to PTJH. Home placement, therefore, was no longer an option for Ben. Thus, although Ben's IEP did not expressly state that the team considered home schooling, the court concludes that Ben suffered no prejudice because that environment was no longer an option.

When the IEP team met again on February 12, 2001, to develop Ben's RTP, plaintiffs again reversed their viewpoint and stated that they preferred home placement. The Notice for Placement and Request for Consent reflects that Ben's IEP team considered plaintiffs' request but rejected the proposal. Certainly plaintiffs did not agree with the IEP team's decision, but the Notice shows that defendant again determined the LRE by considering the continuum of options.

### 3. General Education Integration Statement

A disabled student's IEP should explain "how the child's disability affects the child's involvement and progress in the general curriculum." Individuals with Disabilities Education Act, Amendments for 1997, Pub.L. No. 105–17, § 614(d)(1)(A)(i)(I), 111 Stat. 37 (1997). Moreover, the IEP should include "a statement of measurable annual goals, including benchmarks or short-term objectives" addressing "the child's needs that result from the child's disability to enable the child to be involved in and progress in the general curriculum." *Id.* § 614(d)(1)(A)(ii)(I). As part of the 1997 Amendments to IDEA, Congress found that disabled children would benefit by including them in the general education environment whenever possible. *Id.* § 601(c)(4), (5).

Plaintiffs assert that Ben's IEP did not contain a statement explaining how his special needs impacted his ability to participate in the general education curriculum. According to plaintiffs, defendant failed to connect Ben's special needs to his ability to participate in the general curriculum, which deprived him of the right to an integrated education.

■ Plaintiffs' argument completely disregards column three of Ben's IEP, which is labeled: "Impact on involvement/progress in general curriculum or appropriate activities." This column addresses the impact of each of Ben's special needs on his ability to participate in the general curriculum. At this point in his education, Ben's IEP team had determined that the Lifeskills classroom was the most appropriate educational environment, with the potential existing for long-term integration into the general curriculum. The court concludes that Ben's IEP sufficiently explained how his disability affected his progress in the general curriculum.

### 4. Supplementary Aids, Services, and Program Modifications

IDEA requires that a disabled child be educated in the LRE, which can include the regular education classroom when the use of supplementary aids and services makes this placement possible. 20 U.S.C. § 1412(5)(A). In support of this goal, Kansas law mandates that a disabled child's IEP include a statement of the supplementary aids and services to be provided so that the child may participate in the general curriculum. Kan. Stat. Ann. § 72–987(3).

Plaintiffs contend that Ben's IEP contained no statement of the supplementary services and aids that would have allowed him to be placed in the general education classroom. Plaintiffs concede that defendant did provide for two supplemental pro-

grams for Ben, but nevertheless argue that the IEP does not explain how the programs would assist his function in a normal classroom. Again, as the court discussed above, Ben's IEP team, with participation from his parents, already determined that the regular education environment was not appropriate for him at that time. The court concludes, therefore, that defendant did not prejudice Ben by not detailing in his IEP an aspect of his education that was not even under consideration.

### 5. Full Day of School Services

Plaintiffs argue that Kan. Stat. Ann. § 72–1106 required defendant to provide for at least six hours of educational services in Ben's IEP and RTP. The section plaintiffs cite, however, is a general provision establishing the length of a school term for public schools in the state. The court concludes that § 72–1106 does not apply to and overrides a disabled child's IEP.

■ Further, the record shows that Ben's IEP team attempted to increase the number of hours that he spent at PTJH, but that plaintiffs resisted the change. As part of Ben's IEP, his team concluded that he would resume his education at PJHS gradually in order to ease his transition from home. Then, at Ben's January 22, 2001, IEP meeting, his team recommended increasing his attendance at PJHS from 9:00 a.m. to 3:00 p.m. Plaintiffs objected to that change, however, and agreed only to an additional 45 minutes. The IEP team again suggested increasing Ben's hours of attendance at his January 31, 2001, IEP meeting, but again plaintiffs rejected that idea as well. Plaintiffs are essential decision-makers to his IEP, and as the record shows, his continued restricted hours at PJHS were a result of their unilateral decision. The court therefore concludes that defendant did not fail to provide a full

day of school services, and, indeed, the court questions the good faith basis for plaintiffs' claim.

### 7. Annual Goals

A disabled child's IEP must contain a statement of measurable annual goals, including benchmarks or short-term instructional objectives. Kan. Stat. Ann. § 72–987(b)(2); 34 C.F.R. § 222.50.

Plaintiffs contend that Ben's behavioral annual goal of achieving low levels of self-stimulatory and aggressive behaviors is not supplemented by an explicit definition of these behaviors or short-term benchmarks to measure whether the behaviors were being controlled.

■ The court concludes that, while the annual goal does not contain a measurable benchmark, this failure did not deny Ben a FAPE. IDEA requires that defendant expressly state measurable criteria that helps Ben and his IEP team achieve an annual goal. The IEP's deficiency, however, does not automatically amount to a denial of a FAPE. *Urban,* 89 F.3d at 726. Ben's IEP stated a plan to provide services to address his maladaptive behavior. The court concludes that defendant's failure to identify measurable criteria, while quite possibly a procedural violation, did not deprive Ben of a FAPE because defendant had an identified plan to address the goal.

### 8. Extended School Year Services

Plaintiffs assert that defendant failed to provide for extended school year services ("ESYS") in Ben's November 20, 2000, IEP and February 13, 2001, RTP. Defendant argues that plaintiffs failed to exhaust their administrative remedies to seek relief on this claim.

The due process officer's Pre–Hearing Order record shows that plaintiffs did not

raise this issue in the parties' pre-hearing conference. Plaintiffs' Proposed Findings of Facts and Conclusions of Law as part of the due process hearing marks the first appearance of this argument. Nevertheless, the due process hearing officer listed plaintiffs' argument in his decision and stated that he had considered all of plaintiffs' arguments presented in their proposed findings. While the hearing officer did not directly address the issue in his decision, the court must assume that he considered the argument. The court concludes, therefore, that plaintiffs properly exhausted their administrative remedies.

■ In any event, the court concludes that defendant did not fail to consider ESYS for Ben. Ben's November 20, 2000, IEP does list ESYS as a topic of discussion for the April 2001, IEP meeting. Before the meeting took place, however, Ben's parents removed him from PJHS. The record shows that defendant was unsure as to the length of time that Ben would be absent from PTJH. Ben's educational program was obviously in flux during this time period, and the court concludes that any failure to plan for ESYS resulted from the uncertainty created by withdrawing Ben from PTJH.

### 9. Consultation with Applied Behavior Analysts and Autism Consultants

Plaintiffs assert that Ben's November 20, 2000, IEP did not provide for sufficient ABA and autism consultation to ensure implementation of an effective ABA program. Also, according to plaintiffs, Ben's RTP decreased the hours of consultation, and defendant did not provide testimony of the hours that their consultants, Dr. Barone and Cook, worked.

Defendant first argues that plaintiffs did not raise the issue at the administrative review level. The court again concludes that, because the due process hearing offi-

cer referred to the claim, even while not addressing it, plaintiffs properly exhausted their administrative remedies.

Nevertheless, the court concludes that defendant's provision for ABA and autism consultation did not violate any of Ben's procedural or substantive rights. There is no statutorily mandated requirement that defendant engage the services of consultants for a specific number of hours. The appropriate use of consultants is left to discretion of the disabled student's IEP team. The court will not replace its judgment for that of the IEP team. Further, Ben's parents, as part of his IEP team, never asserted that while participating in the design of his IEPs that consultants were insufficiently employed. The court concludes, therefore, that defendant made appropriate use of consultants.

### 10. Reducing Aggressive Behaviors

Plaintiffs argue that defendant denied Ben a FAPE because his RTP did not return him to a home program in an attempt to reduce his aggressive behaviors. According to plaintiffs, the frequency of Ben's aggressive behaviors began increasing in early February 2001. As a result of this behavioral change, plaintiffs argue, Ben was not receiving educational benefit at PTJH.

Ben returned to PTJH on January 4, 2001, so the court fails to see how an increased measure of aggression during one week in February leads to the conclusion that the school environment was failing to educate him. Further, as the court addressed earlier, the court can reach no conclusion based upon the graphical evidence that plaintiffs proffer. Unfortunately, Ben's aggressive behavior posed a significant challenge for both defendant and plaintiffs, apparently regardless of the environment in which he was educated. Both sides offer anecdotal and empirical evidence of Ben's maladaptive behavior.

Particularly because Ben was continually shifted between home and PTJH, the court cannot determine whether his behaviors were due to the uncertainty of his new environment or a result of either party's choice of corrective behavior methodology.

### 11. Alleged Punishment Procedure

Plaintiffs allege that on January 22, 2001, Dr. Barone used an inappropriate disciplinary technique in response to Ben's aggressive behaviors. Dr. Barone, according to plaintiffs, loudly yelled "No" at Ben before pushing his arms down and physically returning him to his seat. As a result of this technique, plaintiffs argue, Ben increased the intensity of his aggressive behaviors, which resulted in him being denied educational benefit.

Plaintiffs' primary basis for their claim is the testimony of DeWitt, one of Ben's teachers who witnessed the alleged incident. DeWitt's testimony is controverted, however, by Seckar, one of Ben's paraprofessionals who also was present in the class room. In the face of directly conflicting testimony, and without the benefit of observing the witnesses' respective testimony, the court adopts the following conclusion of the due process hearing officer: "Based upon the demeanor of the respective witnesses, the hearing officer finds that Ms. Seckar's version of the events has great credibility." The court therefore concludes that defendant did not employ an improper punishment procedure.

### 12. Design and Implementation of an Effective ABA Program

Plaintiffs contend that defendant failed to establish objective, operational definitions for Ben's behavior, which resulted in defendant's failure to design and implement an effective ABA program.

Kansas law requires that the IEP team consider positive behavioral interventions if the child's behaviors are adversely impeding the child's learning. Kan. Stat. Ann. § 72–987(c)(3). The court cannot identify any legal requirement that defendant develop operational definitions of a disabled child's behaviors, other than defendant's general obligation to take appropriate steps to provide a FAPE.

At the November 20, 2000, IEP meeting, the IEP team had Dr. Barone's behavioral analysis of Ben's home program behavior. The IEP team determined that it would need to review Ben's behavior after six weeks in order to evaluate the behavioral assessment in light of any changes in his conduct in his new environment. The IEP team, therefore, could not have reached a conclusion at that time whether Ben's behaviors at PTJS would impede his learning. Nevertheless, the IEP team designed and implemented ABA techniques to address Ben's behavior. The court concludes that defendant took proper steps address Ben's behavior.

### 13. Transition Period

Plaintiffs assert that defendant denied Ben a FAPE during his transition period back to PTJH. Plaintiffs argue that defendant only provided 2.5 hours a day of education at PTJH during the transition period, and defendant's failure to provide or finance home-based education for the remaining hours in the school day deprived Ben of his educational entitlement.

Plaintiffs argument duplicates the substance of their allegation that defendant failed to schedule six hours of educational services in Ben's IEP and RTP. The court follows its reasoning in addressing plaintiffs' earlier arguments and concludes that defendants did not deny Ben a FAPE.

### B. Did Ben Johnson Receive a FAPE?

The ultimate issue for the court to determine is whether defendant provided Ben with a FAPE. The court addressed in

detail plaintiffs' numerous claims of procedural defects in Ben's IEP and RTP. The court concluded that the evidence did not support plaintiffs' allegations or that the procedural errors were not substantial enough to rise to the level of depriving Ben of a FAPE.

Throughout the course of discussions and negotiations between plaintiffs and defendant, the real basis of plaintiffs' complaint centered on two issues: (1) plaintiffs wanted Ben placed at home; and, (2) plaintiffs believed that defendant should have utilized planned ignoring rather than redirection to control Ben's aggressive behaviors.

 The court already determined that defendant considered the full continuum of options, including home schooling, before concluding that Ben should be placed at PTJH. Moreover, the court concludes that Ben's placement at PTJH did not deprive him of a FAPE. A disabled child is " 'not entitled to placement in a residential school merely because the latter would more nearly enable the child to reach his or her full potential.' " *O'Toole*, 144 F.3d at 708 (quoting *Walczak v. Fl. Union Free Sch. Dist.*, 142 F.3d 119, 132 (2d Cir.1998)). IDEA requires a school district to provide an appropriate education, not the one preferred by the parents. *Id.* (citing *Heather S. v. State of Wis.*, 125 F.3d 1045, 1057 (7th Cir.1997)). The court concludes that Ben's placement at PTJH was reasonably calculated to provide him with a FAPE.

 Plaintiffs' contention that defendant's use of redirection denied Ben a FAPE is not supported by the record or case law. As the due process hearing officer pointed out, plaintiffs do not have the right to compel defendant to employ planned ignoring over redirection. *See Lachman v. Ill. State Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir.1988) ("*Rowley* and its progeny leave no doubt that parents, no matter how well-motivated, do not have a right under the ... [IDEA] to compel a school district to provide a specific program or employ a specific methodology in providing for the education of their handicapped child."). The court, pursuant to the Supreme Court's admonition in *Rowley*, will not second guess the decisions of authorities on educational methodology. *See Rowley*, 458 U.S. at 207, 102 S.Ct. 3034. So long as the court determines that a child's IEP is reasonably developed to provide the child with a FAPE, then the court must leave questions of methodology to the school district. *See id.* at 208, 102 S.Ct. 3034. In this case, defendant employed an accepted behavioral methodology as part of a reasonably designed IEP. The court, therefore, concludes that defendant's choice of redirection over planned ignoring did not deprive Ben of a FAPE.

### *ORDER*

**IT IS THEREFORE ORDERED** that judgment is rendered in favor of defendant on Defendant's Motion for Judgment as a Matter of Law, or in the Alternative, Motion for Summary Judgment (Doc. 27).